IN THE UNITED STATES DISTRICT COURT
FOR THE WESTERN DISTRICT OF PENNSYLVANIA

| TINA MARIE LILLEY, | ) | |
|---|---|---|
| Plaintiff, | ) | |
| | ) | Civil Action No. 09-1300 |
| v. | ) | |
| | ) | |
| COMMISSIONER OF SOCIAL, SECURITY | ) | |
| Defendant. | ) | |

## **MEMORANDUM OPINION**

CONTI, District Judge.

Pending before this court is an appeal from the final decision of the Commissioner of Social Security (the "Commissioner" or "defendant") denying the claim of Tina Marie Lilley ("plaintiff") for supplemental security income ("SSI") benefits under Title XVI of the Social Security Act ("SSA"), 42 U.S.C. §§ 1381-83f. Plaintiff contends that the decision of the administrative law judge (the "ALJ") that she is not disabled, and therefore not entitled to benefits, should be reversed, or in the alternative remanded, because the decision is not supported by substantial evidence. Defendant asserts that the decision of the ALJ is supported by substantial evidence. The parties filed cross-motions for summary judgment pursuant to Rule 56(c) of the Federal Rules of Civil Procedure. The court will deny plaintiff's motion for summary judgment and will grant defendant's motion for summary judgment because the ALJ's decision is supported by substantial evidence.

**Procedural History**

On January 25, 2007, an application for SSI was filed on plaintiff's behalf alleging disability due to depression and bipolar disorder.[1] (R. at 124-30, 154). Plaintiff's claims were denied on October 5, 2007. (R. at 80-84). Plaintiff's case then was randomly selected to test modifications to the disability determination process, and the reconsideration step of the administrative review process was eliminated and the case escalated to the hearing level. (R. at 82). Plaintiff requested a hearing, which was held before the ALJ on December 16, 2008. (R. at 34-78). Plaintiff, who was represented by counsel, testified at the hearing. (R. at 46-72). A vocational expert ("VE") also testified. (R. at 72-76). On March 4, 2009, the ALJ issued an unfavorable decision (R. at 16-33) and plaintiff filed a timely request for review with the appeals council. (R. at 4). After a denial of that request on July 30, 2009, and having exhausted all administrative remedies, plaintiff filed this appeal. (R. at 1-3).

**Plaintiff's Background and Medical History**

At the time of the hearing, plaintiff was nineteen years old. (R. at 46). Plaintiff discontinued her education in ninth grade. (R. at 48). In the past, plaintiff had performed minimal work as a babysitter. (R. at 48-49). Plaintiff asserts that she cannot work due to pain in her right leg secondary to a prior break, bipolar disorder, and depression. (R. at 50, 52).\

---

[1] Plaintiff was under eighteen years old at the time the application was filed.

Medical Evidence

On May 19, 2005, plaintiff was admitted to Mercy Hospital for treatment of a broken right femur stemming from a car accident. (R. at 336-56). A retrograde femoral nailing and rodding was performed on the same date. (Id.) Plaintiff was in stable condition after the operations. (Id.)

Plaintiff had a follow-up for her leg fracture on September 14, 2005. (R. at 277). Dr. Owen Nelson reported that plaintiff had resumed all her normal activities. (Id.) Plaintiff reported a little bit of pain in the knee with some catching impingement symptoms. (Id.) Dr. Nelson noted some soft tissue impingement over the screw heads, but no palpable tenderness to the fracture site. (Id.) He also noted that she was ambulatory without a limp. (Id.) Dr. Nelson suggested that he would wait a little longer to remove the hardware. (Id.) On November 25, 2005, plaintiff underwent x-rays of the right leg and knee due to complaints of pain and swelling. (R. at 275). The x-rays revealed the rod and screw fixation device from the prior fracture along with cortical thickening in the mid-femur compatible with old trauma. (Id.) No acute dislocation or fracture was noted. (Id.)

On March 23, 2007, plaintiff was seen in the emergency room at Highlands Hospital for complaints of severe pain in her knee after feeling a "pop." (R. at 298). Plaintiff underwent an x-ray, which revealed no evidence of fracture and intact hardware. (R. at 267). Ice and morphine were administered as well as a knee imobilizer and crutches. (R. at 300). Plaintiff was again examined at Highlands Hospital on September 19, 2007 for what she described as a "pop" in her leg when she went to get into a car. (R. at 259). An x-ray revealed an intermedullary rod and

3

screw fixation device from her prior fracture with no additional fracture or dislocation and no abnormal soft tissue densities. (Id.)

Psychological Evidence

On November 4, 1999, plaintiff was given testing by her school psychologist, Dr. Joseph Alexander. (R. at 234). At the time, plaintiff was ten and had a verbal IQ score of 80, performance IQ score of 82, and full scale IQ score of 79, indicating intellectual efficacy within the borderline deficient to low average ranges. (R at 234, 236). Dr. Alexander noted that plaintiff had put forth average to failing grades throughout elementary school and had poor school attendance in past years. (R. at 235). Plaintiff's math, reading, and spelling were all associated with kindergarten to first grade levels. (R. at 236). Dr. Alexander suggested an individualized program and a personalized rate of progression in the learning support program. (Id.) He asserted that plaintiff "[would] most likely experience continued academic difficulty if required to progress at a rate commensurate with her grade mates without significant adaptation and intervention." (Id.)

On November 24, 2003, plaintiff was re-evaluated by the school psychologist. (R. at 237). Dr. Jay Steffy noted that plaintiff had been absent fourteen days of the school year to that point and had a history of absenteeism. (Id.) He noted that she followed directions, completed assignments, and accepted adult authority when in school. (R. at 237-38). Plaintiff's testing revealed a full-scale IQ of 90, a verbal comprehension index score of 91, a perceptual organization index score of 86, a working memory index score of 104, and a processing speed index score of 94. (R. at 238). These scores indicated the average range of overall/general

4

cognitive ability. (Id.). Dr. Steffy opined that plaintiff needed to improve school attendance, reading comprehension, and basic division and multiplication. (R. at 241). Dr. Steffy noted that plaintiff got along well with teachers and peers, participated, and had friends in school. (Id.) Plaintiff was working at the fifth grade level in spelling and at the fourth grade level in other subjects. (Id.) Plaintiff met the requirements for a specific learning disability and was continued in the special education program. (R. at 241-45).

Plaintiff was psychiatrically hospitalized from December 19, 2006 to December 22, 2006, due to increasing depression with suicidal ideation. (R. at 213-18). Upon admission, plaintiff tested positive for and admitted using marijuana. (R. at 214-15). Plaintiff's sister reported that plaintiff had been depressed, feeling hopeless, and crying and had attempted to overdose on Trazadone. (R. at 215). Plaintiff reported that she had broken up with her boyfriend recently and had possibly suffered a miscarriage in the previous month. (Id.) Upon mental status examination, plaintiff presented as pleasant, tearful, and depressed. (Id.) She self-rated her depression as a six out of ten. (Id.) She contracted for safety at the examination, but did not deny that she had previously tried to kill herself. (Id.) Plaintiff denied homicidal ideation, hallucinations, and delusions. (Id.) She was oriented times three with normal memory, impaired judgement, and minimal insight. (Id.) Dr. Oscar Urrea, the psychologist, diagnosed major

depression and marijuana abuse with a Global Assessment of Functioning Scale ("GAF") of 30.[2] (R. at 216). Plaintiff was placed on Prozac. (Id.)

Plaintiff was discharged on December 22, 2006. (R. at 217). Discharge notes indicated that plaintiff had done adequately with medications, stabilization, and psychotherapeutic intervention. (R. at 218). She was discharged to the care of her sister and to follow-up psychiatric care. (Id.) Her diagnoses were unchanged and she was assessed with a GAF of 38. (Id.) She was given a fifteen-day refillable prescription for Prozac. (Id.)

On August 13, 2007, plaintiff was evaluated by Dr. Lanny Detore, Ed.D. (R. at 222). Plaintiff reported that she had never received her driver's license, experienced pain in her right leg post-automobile accident, and experienced depression and mood swings due to bipolar disorder. (Id.) Plaintiff reported that she only attended one psychiatric follow-up after her hospitalization due to lack of insurance. (R. at 223). She took Prozac only sporadically, stating that it did not help her symptoms. (Id.) She reported that she stopped smoking marijuana after

---

[2] The GAF assesses an individual's psychological, social and occupational functioning with a score of 1 being the lowest and a score of 100 being the highest. A GAF score of between 21-30 denotes serious impairment. The GAF score considers "psychological, social, and occupational functioning on a hypothetical continuum of mental health-illness." American Psychiatric Association: Diagnostic and Statistical Manual of Mental Disorders (DSM-IV-TR) 34 (4th ed. 2000). An individual with a GAF score of 60 may have "[m]oderate symptoms" or "moderate difficulty in social, occupational, or school functioning;" of 50 may have "[s]erious symptoms (e.g., suicidal ideation . . . .)" or "impairment in social, occupational, or school functioning (e.g., no friends, unable to keep a job);" of 40 may have "[s]ome impairment in reality testing or communication" or "major impairment in several areas, such as work or school, family relations, judgment, thinking or mood; of 30 may have behavior "considerably influenced by delusions or hallucinations" or "serious impairment in communication or judgment (e.g., . . . suicidal preoccupation)" or "inability to function in almost all areas . . .; of 20 "[s]ome danger of hurting self or others . . . or occasionally fails to maintain minimal personal hygiene . . . or gross impairment in communication . . . ." Id.

she was released from the hospital. (Id.) Plaintiff stated that she had been in learning support classes in school, but had dropped out because she did not attend often and was not learning anything. (Id.) Plaintiff reported that she did not get along with her mother, lived with her sister, and hated to be alone. (R. at 224).

Upon mental status examination, plaintiff presented with a "somewhat immature personality." (Id.). Plaintiff exhibited sadness and tearfulness when discussing her fear of being alone. (Id.) She displayed no abnormal mannerisms and was slightly anxious. (Id.) Thought processes were within normal limits, but thought content centered around her "extreme and marked fear of being alone." (R. at 225). Dr. Detore also noted that she was functioning with mood variability and mood changes reflective of an underlying mood disorder. (Id.) She was able to do simple math, abstract thinking was intact, and she functioned within the borderline range of intelligence with a learning disorder. (Id.) Plaintiff exhibited minimal insight and intact judgment. (Id.) She reported no suicidal ideations or further impulses after her hospitalization. (Id.) Dr. Detore indicated that plaintiff had a fair prognosis and would likely experience more trouble with her mood disorder as she aged. (Id.) Dr. Detore diagnosed a mood disorder with bipolar features, not otherwise specified ("NOS") with mild to moderate features at the time; a phobic disorder regarding being alone; and borderline intellectual functioning with a learning disorder, NOS. (R. at 226). Dr. Detore also noted that plaintiff was able to manage her activities of daily living. (Id.)

Dr. Detore opined that plaintiff had slight limitations in understanding, carrying out, and remembering short, simple instructions; slight to moderate limitations in making judgments on

simple, work-related decisions; moderate limitations in understanding, remembering, and carrying out detailed instructions; interacting appropriately with supervisors and co-workers; responding appropriately to work pressures in a usual work setting; responding appropriately to changes in a routine work setting; and moderate to marked limitations interacting appropriately with the public. (R. at 220).

On September 24, 2007, Dr. Richard Heil completed a childhood disability evaluation form. (R. at 228-33). He noted that plaintiff did not meet a childhood listing. (R. at 228). He also noted that plaintiff had less than marked limitations in acquiring and using information, attending and completing tasks, interacting and relating to others, and caring for herself and no limitations in moving and manipulating objects and in health and physical well-being. (R. at 230-31).

Plaintiff was evaluated by Bonita Wardle-Roche, CRNP, at Chestnut Ridge Counseling Services, Inc. on November 13, 2008. (R. at 332-33). Plaintiff complained of mood swings, impulsive behaviors, and racing thoughts. (R. at 332). She displayed no physical abnormalities and had a normal gait. (Id.) Upon mental status examination, plaintiff had good eye contact; slow and soft, but somewhat rapid speech; affect noted as "a little dull"; no suicidal or homicidal ideations; good memory; fair language; average or below fund of knowledge; fair concentration and attention; impaired impulse control; impaired insight and judgment; and a "severe" risk assessment. (Id.) Ms. Wardle-Roche assessed bipolar disorder, most recent episode depression with a GAF of 48. (R. at 333). She was started on Citalopram and Depakote. (Id.) Plaintiff did not attend any follow-up appointments, and her case was closed. (R. at 328).

## Standard of Review

An administrative law judge's findings, subsequently adopted by the Commissioner, that deny benefits to a claimant are subject to judicial review. 42 U.S.C.A. § 405(g). This court must determine whether the administrative law judge's findings of fact are supported by substantial evidence. Id. Substantial evidence may be defined as somewhat less than a preponderance of evidence, but more than a scintilla of evidence. Plummer v. Apfel, 186 F.3d 422, 427 (3d Cir. 1999). If a "'reasonable mind might accept [such evidence] as adequate,'" it is substantial. Ventura v. Shalala, 55 F.3d 900, 901 (3d Cir. 1995) (quoting Richardson v. Perales, 402 U.S. 389, 401 (1971)). Under this standard, this court cannot substitute its own conclusions for those of the administrative law judge. Burns v. Burnhart, 312 F.3d 113, 118 (3d Cir. 2002) (citing Williams v. Sullivan, 970 F.2d 1178, 1182 (3d Cir. 1992)).

## Discussion

Two separate disability standards apply to plaintiff's case because she was seventeen at the time she applied for SSI benefits and turned eighteen before the ALJ rendered his opinion. 20 C.F.R. § 416.924 (f). For the claimed period of childhood disability, the regulations set forth a three-step sequential analysis for determining whether a plaintiff is disabled. 20 C.F.R. § 416.924(a)-(d). Under this analysis, plaintiff must demonstrate that: (1) she was neither working nor engaged in substantial gainful activity; (2) she has a medically determinable impairment that was severe; (3) the medically severe impairment met, medically equaled, or functionally equaled one of the listings. 20 C.F.R. § 416.924(b)-(d).

In a case where a child's impairments do not meet a listing, a determination must be made as to whether the child's impairment functionally equals a listed impairment. 20 C.F.R. § 416.924 (a). To functionally equal a listing, the child must exhibit "marked" limitations in two domains of functioning or "extreme" limitation in one domain. Id. The six domains are: (1) acquiring and using information; (2) attending and completing tasks; (3) interacting and relating with others; (4) moving about and manipulating objects; (5) caring for oneself; and (6) health and physical well-being. 20 C.F.R. § 416.924a(b)(1)(I)-(iv). "Marked" limitations in these areas "seriously" interfere with a claimant's ability to independently initiate, sustain, or complete activities and an "extreme" limitation "very seriously" interferes with a claimant's ability to independently initiate, sustain, or complete activities. 20 C.F.R. § 416.924a(e)(2)-(3).

To establish an adult disability under the SSA, a plaintiff must demonstrate his "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period not less than twelve months." 42 U.S.C. § 423(d)(1)(A). The nature and extent of these mental or physical impairments must be so severe that they preclude the plaintiff not only from returning to his or her previous employment but also from acquiring substantial gainful work that exists in the national economy, considering his age, education, and prior work experience. 42 U.S.C. § 423(d)(2)(A).

The administrative law judge follows a five-step sequential evaluation for determining disability. The five-step process evaluates the following elements: (1) whether the plaintiff is currently engaged in substantial gainful activity; (2) if not, whether the plaintiff has a severe

impairment; (3) if so, whether the impairment meets or equals the criteria of an impairment listed in 20 C.F.R. pt. 404, subpt. P, app.1; (4) if not, whether the plaintiff's impairment prevents him from performing his past work; (5) and if not, whether the plaintiff can perform any other work in the national economy, given the plaintiff's age, education, and work experience. 20 C.F.R. §§ 404.1520, 416.920. The burden of proof with respect to steps one through four lies with the plaintiff, while the defendant bears the burden of proof with respect to step five. Sykes v. Apfel, 228 F.3d 259, 263 (3d Cir. 2000).

In the instant case, the ALJ determined that: (1) plaintiff had not engaged in substantial gainful activity since the alleged onset date; (2) she suffers from the following severe impairments: mood disorder with bipolar features, NOS, and phobic disorder; (3) these impairments do not satisfy or medically equal one of the impairments listed in 20 C.F.R. pt. 404, subpt. P, app. 1, Part A or B; (4) before attaining age eighteen, plaintiff did not have an impairment or combination of impairments that functionally equaled the listings; (5) plaintiff was not disabled prior to attaining age eighteen; (6) plaintiff did not develop any new impairments after attaining age eighteen; (7) plaintiff has no past relevant work and (8) plaintiff has the residual functional capacity to perform a full range of work at all exertional levels, with certain modifications and could perform jobs existing in significant numbers in the national economy. (R. at 20-33).

Plaintiff raises several arguments with respect to the decision of the ALJ: 1) first, that the ALJ should have found that symptoms relating to plaintiff's right femur fracture and surgery were a severe impairment; 2) second, that the ALJ failed to credit properly plaintiff's complaints

of leg and knee pain; 3) and third, that the ALJ erred in formulating the hypothetical question to the vocational expert, which also resulted in error in his assessment of plaintiff's residual functional capacity. Each argument will be addressed.

        A.       Determination of Severe Impairments and Credibility – Issues 1 and 2

Plaintiff argues that the ALJ erred in failing to consider pain relating to her right femur fracture as a severe impairment suggesting that "plaintiff's right shaft femur fracture [was] something more than a 'slight' abnormality." (Plaintiff's Brief for Summary Judgment ("Pl.'s Br."), Docket No. 6, at 14). Plaintiff asserts that she testified to continued pain and swelling in her knee with the limited ability to bend, stoop, stand, and walk. Plaintiff argues that the ALJ failed to give proper credit to these complaints. Plaintiff focuses on the medical evidence post-dating her fracture, which she contends supports her claims of significant leg and knee pain.

An impairment is severe if it imposes significant restrictions in the ability to perform basic work activities. Social Security Ruling 85-28. "An impairment or combination of impairments can be found 'not severe' only if the evidence establishes a slight abnormality or a combination of slight abnormalities which have 'no more than a minimal effect on an individual's ability to work.'" Newell v. Comm'r of Soc. Sec., 347 F.3d 541, 546 (3d Cir. 2003) (citing SSR 85-28). "The severity step...should only be used to screen out *de minimis* claims." Roberts v. Massanari, Civ. A. 00-6131, 2001 WL 1580241, at *3 (E.D.Pa. Dec. 10, 2001)(citing Bailey v. Sullivan, 885 F.2d 52, 56-57 (3d Cir. 1989)).

An administrative law judge must also give serious consideration to the claimant's subjective complaints, even when those assertions are not fully confirmed by objective medical

evidence. See Mason v. Shalala, 994 F.2d 1058, 1067-68 (3d Cir.1993); Welch v. Heckler, 808 F.2d 264, 270 (3d Cir. 1986). Pain alone, if sufficiently severe, may be a disabling impairment that prevents a claimant from performing any substantial gainful work. E.g., Carter v. R.R. Ret. Bd., 834 F.2d 62, 65 (3d Cir. 1984) (relying on Green v. Schweiker, 749 F.2d 1066, 1068 (3d Cir. 1984)); Smith v. Califano, 637 F.2d 968, 972 (3d Cir. 1981); Dobrowolsky v. Califano, 606 F.2d 403, 409 (3d Cir. 1979). Similarly, an administrative law judge must give great weight to a claimant's subjective description of his or her inability to perform even light or sedentary work when this testimony is supported by competent evidence. Schaudeck v. Comm'r of Soc. Sec., 181 F.3d 429, 433 (3d Cir. 1999), relying on Dobrowolsky.

Where a medical impairment that could reasonably cause the alleged symptoms exists, the administrative law judge must evaluate the intensity and persistence of the pain or symptom, and the extent to which it affects the individual's ability to work. This obviously requires the administrative law judge to determine the extent to which a claimant is accurately stating the degree of pain or the extent to which he or she is disabled by it. *See* 20 C.F.R. § 404.1529(c). Hartranft v. Apfel, 181 F.3d 358, 362 (3d Cir. 1999). If an administrative law judge concludes that the claimant's testimony is not credible, the specific basis for such a conclusion must be indicated in his or her decision. See Cotter, 642 F.2d at 705. The United States Court of Appeals for the Third Circuit quoted:

> "in all cases in which pain or other symptoms are alleged, the determination or decision rationale must contain a thorough discussion and analysis of the objective medical and the other evidence, including the individual's complaints of pain or other symptoms and the adjudicator's personal observations. The

> rationale must include a resolution of any inconsistencies in the
> evidence as a whole and set forth a logical explanation of the
> individual's ability to work."

Schaudeck, 181 F.3d at 433 (quoting SSR 95-5P).

Substantial evidence supports the ALJ's determination that plaintiff's fracture and post-fracture complaints of pain were not severe impairments within the meaning of the regulations. He did not err in assessing plaintiff's credibility with respect to these claims. In the opinion, the ALJ noted that plaintiff broke her leg on May 19, 2005. (R. at 22; 336-56). By September 2005, only four months later, plaintiff had resumed all her normal activities. (R. at 277). Later x-rays revealed the rod and screw placement and showed no signs of further fracture or dislocation. (R. at 259, 267, 275). The medical records do not support a finding that plaintiff was suffering from more than minimal complications from her fracture. Her subsequent visits to the emergency room garnered no evidence of sustained difficulties and no further treatment was undertaken. (R. at 259, 267, 275). As a result, the ALJ did not err in determining that the claimed post-fracture pain and associated ambulatory difficulties were not severe impairments and that plaintiff's testimony relating to her leg and knee pain was not entirely credible.

###### B. Hypothetical Question and Residual Functional Capacity – Issue 3

Plaintiff argues that the hypothetical question and residual functional capacity formulated by the ALJ did not include all of her well-supported limitations stemming from her mental impairments and pain. Plaintiff suggests that the ALJ focused on irrelevant issues during the hearing rather than focus on her asserted difficulties. "''Residual functional capacity'[RFC] is

defined as that which an individual is still able to do despite the limitations caused by his or her impairment(s).'" Burnett v. Comm'r of Soc. Sec., 220 F.3d 112, 121 (3d Cir. 2000) (quoting Hartranft v. Apfel, 181 F.3d 358, 359 n.1 (3d Cir. 1999)). A claimant's residual functional capacity represents the most, not the least, that a person can do despite his or her limitations. See Cooper v. Barnhart, Civil Action No. 06-cv-2370, 2008 WL 2433194, at *2 n.4 (E.D.Pa. June 12, 2008) (citing 20 C.F.R. § 416.945(a)). In determining a person's residual functional capacity, an administrative law judge must consider all evidence of record. 20 C.F.R. §§ 404.1520, 416.920. Although an administrative law judge can weigh the credibility of the evidence when making a residual functional capacity determination, he or she must give some indication of the evidence which is rejected and the reasons for doing so. Id. As the court stated in Burnett, "'[i]n the absence of such an indication, the reviewing court cannot tell if significant probative evidence was not credited or simply ignored.'" Id. at 121 (quoting Cotter v. Harris, 642 F.2d 700, 705 (3d Cir. 1981)).

In the opinion, the ALJ found plaintiff capable of all levels of exertional work with the additional stipulation that she have no more than occasional contact with the general public. Plaintiff suggests that additional limitations, including potential absenteeism more than one or two days a week, inability to control her temper, and the potential to be off-task one third of the work day due to her mental and physical symptoms, should have also been incorporated into the hypothetical question and residual functional capacity. Substantial evidence supports the ALJ's discussion that plaintiff's mental health treatment was minimal and sporadic. Her treatment records do not support a finding that plaintiff was unable to control her temper on a regular

basis. Plaintiff, in fact, had gotten along well with others in school settings and had friends. (R. at 241). Early school records do not suggest temper difficulties. (R. at 234-36, 237-45). Later treatment records are similarly devoid of notations relating to temper.

In addition, the record does not support a finding that plaintiff would be off task as much as one-third of the work day with regular absenteeism. None of plaintiff's doctors, either treating or consulting, suggested that plaintiff was incapable of sustained work or would suffer from these specific limitations. Plaintiff's physical complaints of severe knee and leg pain, as discussed above, are correspondingly unsupported in the record. As a result, it was appropriate for the ALJ to formulate the hypothetical question and residual functional capacity determination without these specific limitations.

## Conclusion

The ALJ's decision to deny plaintiff SSI is supported by substantial evidence of record. Therefore, defendant's motion for summary judgment (Docket No. 7) shall be granted and plaintiff's motion for summary judgment (Docket No. 5) shall be denied.

By the court,

/s/ JOY FLOWERS CONTI
Joy Flowers Conti
U. S. District Judge

Dated: June 9, 2010